**Alva M. MARKLE, Jr., Respondent,**

v.

**COLUMBIA UNION NATIONAL BANK AND TRUST COMPANY, Appellant.**

No. 25740.

Missouri Court of Appeals, Kansas City District.

June 5, 1972.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 6, 1972.

Application to Transfer Denied Sept. 11, 1972.

William H. Leedy and Daniel M. Dibble, Kansas City, for appellant; Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, of counsel.

Lloyd S. Hellman, Kansas City, for respondent.

PRITCHARD, Judge.

Plaintiff recovered a judgment pursuant to the verdict of a jury for wrongful repossession of his 1968 Cadillac automobile in the amount of $540.80 actual damages and $3,000.00 punitive damages. The determination of the issue which will dispose of this appeal is whether there was sufficient evidence that defendant waived its option to accelerate the due dates of future installments of a note and mortgage, and was thus estopped to repossess plaintiff's car.

The automobile was purchased by plaintiff in August, 1968, when he was 26 years old, single, and was employed as a sales representative. At that time he signed a chattel mortgage and promissory installment note for time balance due, $6,051.94, payable in 35 installments of $168.00, the 36th one being for $171.94. The first installment was payable 9–27–68. The Roach Cadillac, Inc., to which the note was payable, assigned it to defendant (then Union National Bank). Plaintiff made payments to defendant substantially on time until October, 1969, at which time he lost his job with the North Kansas City Health Spa. He failed to make the November and December, 1969 payments, and was attempting unsuccessfully, to find work. He then owed a balance of $4,436.00 on the note.

On January 19, 1970, pursuant to a request by defendant's representative, plaintiff went to the bank to discuss the fact that he was two payments behind. There he talked with Mr. Robert Guntert whom he told, in explanation of the delinquent payments, that he had been in New York, and returned because his parents were ill. "Both of them were concerned with illness, one with an operation and one with a fractured leg, and so I was hunting for work here rather than going back to New York. I wasn't going back to New York. I could but I didn't want to. And he basically understood and we have a very pleasant conversation in regard to my looking for work. I explained to him that I had enough money in the bank to make a pay-

ment at that time." Plaintiff told Mr. Guntert that he had a job with Lay-Rite Floor Covering as soon as there were two or three jobs to go on, that he had probably $15.00 more in the bank than the payment "so I felt that if he could hold off for two or three days * * * I knew that I could go to work and there wouldn't be any problem with this so I explained that." Defendant's Vice-President, Mr. Ricketson, came over during the conversation, and said, "Well, he just looked at me and he said, 'The bank—you are two payments behind. I think you ought to leave the car here.' I explained to him that I was hunting for a different sales job, I needed it to go out and find the job. And Mr. Guntert interrupted and explained to him the payment records and showed him that was in my favor." Mr. Ricketson then directed Mr. Guntert in regard to having two payments in by January 30th, and left. Mr. Guntert then asked plaintiff if he could not possibly try and get him the two payments by the 30th of the month. "A. I didn't promise him anything. I told him that I had the one payment and I said, 'I can not guarantee you that I will have two. I will send you the one but I can not guarantee you two.'"

At the time of the conversation the topic of wanting plaintiff to pay off the note in full was not discussed by either Mr. Ricketson or Mr. Guntert, nor did they tell plaintiff that he had a certain deadline to sell the car and pay off the note balance, the payoff figure also not being discussed. Nothing was said about repossession of the car, other than plaintiff's surrendering it as he testified.

Four or five days later plaintiff went to work for Lay-Rite, and on January 22nd, mailed a check to defendant for the January 27th payment, which check cleared the bank before the payment was due. After he made the payment, a young fellow called him and asked if he had gone to work yet, and plaintiff told him it would be two or three days, and that he was still in contact with Lay-Rite. Plaintiff told

him that he did not have the money to make the two payments. No demand to pay the note in full was then made, and no call of the note was made.

On February 25, 1970, at 4:00 a. m., plaintiff's car was taken by defendant from the parking area next to where he lived. The next day after learning from the police that defendant had repossessed the car, plaintiff talked with Mr. Ricketson who told him that they "simply didn't want to hold it on account any more" and said that they were not going to give the car back when plaintiff asked him to do so. Plaintiff had previously tried to sell the car, and had shown it to two persons. He testified that market value of the car at the time it was repossessed was about $3,800.00.

On cross-examination plaintiff acknowledged that neither Mr. Guntert nor Mr. Ricketson told him they would not repossess the car. At the time or repossession, the November and December payments were behind. There was nothing disturbed on the premises when the car was repossessed, and there was no damage to the house or lawn. By defendant's letter of February 25, 1970, plaintiff was notified that defendant proposed to sell the car on March 7, 1970, and he was advised that redemption could be had prior to sale by making arrangements with defendant. All of plaintiff's personal property found in the car, except (as he testified) three stereo tapes, was returned to him.

Called by plaintiff, Robert L. Guntert testified that he had been employed in its installment loan department for 4½ years as collection manager. Mr. Ricketson was his superior. He talked with plaintiff about his account after he came to the bank at the request of some other employee. At the termination of the conversation, no one demanded "as such" that plaintiff leave the keys or his car at the bank. Guntert had a discussion about plaintiff's circumstances, "and we had agreed to set up the account for a period

of time for two payments. * * * Q And nobody demanded that he pay the note in full there at that conversation, either you or Mr. Ricketson, your boss? A At that particular time, no." After the discussion of January 19th, plaintiff made a payment on January 28th which was posted on the account, which was known by Mr. Ricketson, who made the decision "to have that car repossessed at that time" without "waiting even for the February 27th payment." Guntert called in Earl Sutterby, a professional repossessor. He was aware of different methods of repossession, as by suit being filed. Plaintiff's car was sold to Jett Motors for $3,250.00 (as per the bank records). The balance due on the note, about $156.00 was charged off at the bank, and no attempt to collect it from plaintiff was made.

■ The two cases cited and relied upon by plaintiff, Edwards v. Smith, Mo., 322 S.W.2d 770; and Capital City Motors, Inc. v. Thomas W. Garland, Inc., Mo., 363 S.W.2d 575, set forth facts under which a holder of a note may be held to have waived his option to accelerate the maturity of the entire debt upon default of an installment where the note contains an acceleration clause. The basic consideration is stated in 10 C.J.S. Bills and Notes § 251, p. 752, "The acts and words relied on to constitute a waiver must be such as to justify the maker in believing and acting on the belief that the right will not be exercised without granting him an opportunity to protect himself by payment from the penalties incident to acceleration."

■ Under the evidence, and as conceded by plaintiff, all that defendant's officers offered him was to set up the account for *two* installment payments by January 30th. At the time of the conference with Guntert and Ricketson, plaintiff was in default on the November and December, 1969, installments. On the 27th of January, 1970, another installment would have been due. Plaintiff paid only one installment and thus did not meet the condition imposed upon him by defendant. If he had made the two payments by January 30th, there would have been no question of the defendant's waiver of its option to accelerate the entire debt. Compare Hewitt v. Dean, 91 Cal. 5, 27 P. 423, 424, where it was held to be no waiver where the holder of the note told defendant he could have a few more days to pay the interest on the note, but the defendant paid nothing. The Hewitt case disposes also of plaintiff's apparent contention that an overt act of defendant showing its exercise of the option to accelerate the note was required to be brought home to him. Since waiver does not exist under the facts here, the terms of the note authorizing such action without notice to plaintiff are controlling. Repossession was a sufficient overt act. By his own failure to meet the condition, plaintiff may not insist that defendant lost its contractual right to declare acceleration. And, as noted by defendant, plaintiff acknowledged that Guntert and Ricketson did not tell him they would not repossess the car. No fact appears that would give a valid basis for plaintiff's contention that he was lulled into a false sense of security. He cites no case on the facts here that would sustain the judgment. The Edwards and the Capital City Motors cases, supra, are not helpful to plaintiff. They are distinguishable on their facts. In Edwards, there was a long series of late payments and default of installments, and there was evidence that the holder of the note after its execution agreed that the plaintiff could make infrequent multiple payments and that he would not foreclose if that manner of payment was followed. In Capital City Motors, the evidence was that there was a tender of the one overdue payment before an attempt was made by the holder of the note to declare the whole debt due, thus cutting off the holder's right to exercise the option.

The judgment is reversed.

All concur.